## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 9:17-cv-80203-RLR/JMH

TRIAXX ASSET MANAGEMENT LLC,
TRIAXX PRIME CDO 2006-1, LTD.,
TRIAXX PRIME CDO 2006-2, LTD., and
TRIAXX PRIME CDO 2007-1, LTD.,

                        Plaintiffs,

    v.

OCWEN LOAN SERVICING, LLC,

                        Defendant.

---

## AMENDED COMPLAINT

Plaintiffs Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd. (the "Triaxx CDOs"), together with Plaintiff Triaxx Asset Management LLC, the collateral manager for the Triaxx CDOs (together with the Triaxx CDOs, "Triaxx"), as holders of certificates in certain mortgage-backed securitization trusts listed in Exhibit A (the "Trusts"), bring this action against Defendant Ocwen Loan Servicing, LLC ("Ocwen") and allege as follows:

## NATURE AND SUMMARY OF ACTION

1.    This is an action against Ocwen, the current servicer for each of the Trusts, for breaching the contracts under which it serviced mortgage loans in the Trusts (the "Mortgage Loans"), including the Pooling and Servicing Agreements ("PSAs") governing the Trusts.  This action also

seeks redress for Ocwen's breach of duties it owed to Triaxx that were independent of the applicable agreements.

2.      With respect to its contractual obligations, Ocwen breached the applicable contracts by failing to properly service the Mortgage Loans, thus depriving investors like Triaxx (also referred to as "Certificateholders") of the returns that proper servicing would have generated.  In fact, an analysis of the Mortgage Loans in the Trusts shows that Ocwen's improper servicing affected Mortgage Loans with an original principal balance of approximately $480 million and booked losses of approximately $175 million.  Ocwen's servicing failures with respect to the Mortgage Loans fit within an extensive pattern of improper servicing practices that have been the subject of enforcement actions brought by numerous federal and state regulators.  Those enforcement actions show that Ocwen's failure to adhere to industry servicing practices was so widespread and persistent as to be systemic.

3.      Ocwen's failure to properly service the Mortgage Loans took many forms.  For example, Ocwen modified the Mortgage Loans improperly by forgiving excessive amounts of the Mortgage Loan—sometimes so that the balance of the modified Mortgage Loan was significantly *lower* than the market value of the property securing it.  By making improper modifications and thus keeping Mortgage Loans in the Trusts, instead of liquidating the Mortgage Loans as would have been appropriate, Ocwen was able to charge additional fees that enriched itself at the expense of the Certificateholders, including Triaxx.

4.      Similarly, Ocwen liquidated mortgaged properties for well below their fair market value.  Ocwen also booked losses on liquidated Mortgage Loans that were in excess of what would be expected based on reasonable liquidation costs, suggesting that Ocwen incurred excessive liquidation costs, which it then passed on to the Certificateholders.  Further, Ocwen allowed

Mortgage Loans to stay delinquent for unreasonably long times without acting to resolve those delinquencies by, for example, modifying the Mortgage Loan or foreclosing on the property.  By unduly delaying the resolution of delinquencies, Ocwen again was able to enrich itself with additional fees at the expense of the Certificateholders, including Triaxx.  When Ocwen did try to foreclose on a property, it often mishandled the foreclosures—for example, by using false affidavits in the foreclosure proceedings—so that the foreclosures were not effective.

5.      Ocwen's servicing failures here resemble the misconduct by Ocwen that was the subject of various consent orders, investigations, and enforcement proceedings involving over fifty federal and state regulators—many of which involved misconduct contemporaneous with Ocwen's misconduct here.  For example, in a 2014 consent order with the New York State Department of Finance, Ocwen agreed to findings by an independent compliance monitor that Ocwen had engaged in numerous and significant improper foreclosure practices in prior years, such as failing to confirm that it had the right to foreclose before initiating foreclosure proceedings, failing to ensure that its statements in foreclosure proceedings were correct, pursuing foreclosure while modification applications were pending ("dual-tracking"), and failing to maintain records confirming it was not pursuing foreclosure of military service members on active duty.  In the same consent order, Ocwen also agreed to findings of conflicts of interests with vendors it used, including hiring an affiliated company at inflated rates to run property auctions.  Those are only some of the improper servicing practices by Ocwen that have been the subject of various regulatory actions.

6.      Under the PSAs and other contracts at issue here, Ocwen, as servicer for the Trusts, had the duty to service the Mortgage Loans according to certain minimum standards that the PSAs and

other contracts set out.  These standards generally required Ocwen to service the Mortgage Loans in a reasonable manner.  This Ocwen failed to do.

7.    Ocwen also owed extra-contractual duties to Certificateholders, including the duty to avoid conflicts of interest and to perform ministerial acts with due care.  Whether out of self-interest or out of total indifference to its responsibilities, Ocwen enriched itself at the expense of Certificateholders, including Triaxx, by, for example: using related entities that charged excessive fees; by failing to take timely action on delinquent loans (which allowed Ocwen to continue to charge fees to the Trusts); and improperly modifying or foreclosing on loans (which also potentially allowed Ocwen to receive fees to which it otherwise would not have been entitled).  Among other failures to exercise due care in performing ministerial acts, Ocwen also failed to maintain accurate loan information, unduly delayed in verifying information concerning loans whose mortgage-servicing rights it acquired, misreported loan information to borrowers, mismanaged borrower escrow accounts, and failed to identify and communicate with successors in interest to deceased borrowers—all of which would have caused excessive fees and expenses to be charged to the Trusts and borrower resources to be diverted from paying principal and interest to the Trusts.

8.    Ocwen's breaches of its contractual and other duties were so pervasive as to be grossly negligent or in reckless disregard of its obligations and duties.  Ocwen's breaches caused the holders of certificates in the Trusts, including Triaxx, to sustain massive losses.  Ocwen's improper servicing practices affected Mortgage Loans with an original principal balance of approximately $480 million and booked losses of approximately $175 million.  Moreover, Ocwen was on notice of its improper servicing practices through the many regulatory proceedings against it, which began as early as 2011 and continue through 2017.  The fact that, despite such awareness, Ocwen

nevertheless failed to properly service the Mortgage Loans at issue here further shows that Ocwen was grossly negligent or worse.

## THE PARTIES AND RELEVANT NON-PARTIES

9.     Plaintiff Triaxx Asset Management LLC is a limited liability company organized and existing under the laws of the State of Delaware.  Triaxx Asset Management LLC serves as the Collateral Manager for Plaintiffs Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd.

10.    Plaintiffs Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd. are each a corporation, also referred to as an exempt company, organized under the laws of the Cayman Islands with a principal place of business located at Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002.

11.    Triaxx acquired its certificates in the Trusts around the time of the inception of the Trusts and, at the time of the commencement of this action, held at least 25% of the Percentage Interests of the Class for each of the following Trusts: RALI 2005-QS9, RALI 2005-QS11, RALI 2006-QS16, RALI 2006-QS18, RALI 2007-QS1, RALI 2007-QS8, and RFMSI 2007-S4 (the "RALI/RFMSI Trusts").  Triaxx also, at the time of the commencement of this action, held at least 25% of the Voting Rights for RAST 2007-A1 (the "RAST Trust").

12.    Defendant Ocwen Loan Servicing, LLC is the Servicer or Master Servicer for each of the Trusts.   Upon information and belief, Ocwen is a Delaware limited liability company that maintains its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409 and Ocwen's sole member is Ocwen Mortgage Servicing, Inc., which is incorporated and has its principal place of business in the U.S. Virgin Islands.  Ocwen Financial Corporation, which "owns all of the common stock of its primary operating subsidiary, Ocwen

Mortgage Servicing, Inc.," describes itself as a "leader in the servicing industry" that has "competitive advantages and achieve[s] [its] results through the use of proprietary technology and processes." Ocwen Fin. Corp., Annual Report (Form 10-K), at 3, F-9 (Mar. 3, 2014). For example, with respect to commercial mortgage loan servicing, Ocwen claims that its "experienced professionals, streamlined processes and proprietary technology provides Ocwen with the ability to accurately service and quickly resolve large and small balance commercial portfolios." Ocwen Fin. Corp., *Commercial: Services*, http://www.ocwen.com/commercial/services (last visited Oct. 16, 2017).

13.    Non-party Deutsche Bank National Trust Company is Trustee for the RAST Trust.

14.    Non-party Deutsche Bank Trust Company Americas is Trustee for the each of the RALI/RFMSI Trusts.

<u>JURISDICTION AND VENUE</u>

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff Triaxx Asset Management LLC is a citizen of New York State for purposes of the diversity statute: its sole member is Triaxx Holdco, LLC, whose members are Nicholas Calamari and Vishal Garg, both of whom are United States citizens domiciled in New York. Plaintiffs Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd. are each a citizen of the Cayman Islands, a "foreign state" under the diversity statute. Defendant Ocwen is a citizen of a "State" different from New York State for purposes of the diversity statute: upon information and belief, Ocwen is a Delaware limited liability company that maintains its principal place of business in Florida, and its sole

member, Ocwen Mortgage Servicing, Inc., is incorporated and has its principal place of business in the U.S. Virgin Islands.

16.    This Court has general and specific personal jurisdiction over Ocwen.  For example, upon information and belief, since 2002, Ocwen has had its principal place of business in Florida, has been registered to do business in Florida, and has regularly conducted business throughout the state.  In addition, a large number of the Mortgage Loans in the Trusts at issue and for which Ocwen was the Servicer or Master Servicer are secured by properties in Florida, and a substantial percentage of the breaches alleged herein relate to properties in Florida.  Personal jurisdiction over Ocwen is therefore also appropriate under Florida's long-arm statute (Fla. Stat. § 48.193).

17.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Ocwen resides in the Southern District of Florida.

## FACTUAL ALLEGATIONS

### I.    Standing

18.    Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd. (collectively, "Triaxx CDOs") are the issuers of collateralized debt obligations that entitle purchasers to a portion of the cash flows generated by a portfolio of asset-backed securities acquired by the issuer.  These asset-backed securities—including certain residential mortgage-backed securities ("RMBS") at issue here—serve as collateral assets for notes issued by the Triaxx CDOs.

19.    Each Triaxx CDO, as issuer, entered into an indenture (the "Indentures") and a collateral management agreement (the "Collateral Management Agreements" or "CMAs") under which the notes would be issued and the collateral would be managed.  These agreements work in tandem and, for each Triaxx CDO, these agreements were entered into on the same date.

20.     The Indentures appoint a trustee, and the Collateral Management Agreements appoint a "Collateral Manager" to manage the collateral.  The Collateral Management Agreements and the functions of the Collateral Manager are expressly contemplated by, and integrated into, the Indentures.  Triaxx Asset Management LLC now serves as the Collateral Manager for all three Triaxx CDOs.

*A.  Triaxx CDOs*

21.     The Indentures assign certain of the Triaxx CDOs' rights to the trustees, but this assignment provides that it was for a limited purpose: to secure the Senior Notes and to secure certain other obligations.

22.     Specifically, the Indentures contain a clause by which the Triaxx CDOs grant "right, title and interest" in the collateral to the trustees, who hold those collateral assets in trust for the benefit of the noteholders and certain other secured parties.  This clause is limited, however, and provides that it is made "to secure the Senior Notes" and secure certain other obligations.  In relevant part, the provision provides:

> Such Grants are made, however, to the Trustee to hold in trust, to secure the Senior Notes equally and ratably without prejudice, priority or distinction between any Senior Note and any other Senior Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure [certain other secured obligations].

23.     A different provision in the Indentures, Section 7.5 titled "Protection of Collateral," makes clear that, notwithstanding the assignment of rights as security, the Triaxx CDOs retain a concurrent right with the trustees to protect the Collateral, including by suing on it:

> The Issuer [Triaxx] (or the Trustee on behalf of the Issuer) . . . shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to: . . .

(iv) enforce any of the Pledged Securities or other instruments or property included in the Collateral; . . . .

24.    Consistent with the limited assignment to the trustees, the Triaxx CDOs retained a license, which remains in effect, to exercise all rights as issuers under those agreements without notice to or the consent of the trustees.  Section 15.1 of the Indentures assigns all of the Triaxx CDOs' rights under the CMAs to the trustees as security.  But to ensure the Issuer and the Collateral Manager can still fulfill their obligations under the CMAs, the same section in the Indentures immediately licenses those rights back to the Triaxx CDOs:

> [T]he Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Management Agreement without notice to or the consent of the Trustee . . . .

25.    That is to say, to the extent the trustees have any rights under the CMAs under the Section 15.1 assignment, the Triaxx CDOs have a license to exercise those rights as well.[1]

26.    The Triaxx CDOs are obligated to duly and punctually pay all principal and interest to the noteholders and Section 7.5 of the Indentures establishes the Triaxx CDOs' right to sue under the contracts, as it requires the Triaxx CDOs, as issuer, to take such actions as may be necessary or advisable or desirable to secure the rights of the secured parties and to enforce any of the collateral.

27.    Further, nothing in the Indentures assigns any extra-contractual claims to the trustees. Rather, the Triaxx CDOs have standing to sue based on the injuries Ocwen caused by its grossly negligent, reckless, and willful conduct that breached duties Ocwen owed independent of the applicable agreements.

---

[1] To the extent that the Court has previously rejected certain arguments as to the standing of the Triaxx CDOs, Plaintiffs re-allege the factual predicate for those arguments here to, among other things, preserve their appellate rights.

*B. Triaxx Asset Management LLC*

28.    In the Collateral Management Agreements, each Triaxx CDO "together with its successors and assigns," grants the Collateral Manager (Triaxx Asset Management LLC) broad powers to manage, and take other actions respecting, the collateral, including the power to exercise rights or remedies with respect to the collateral as provided in the underlying instruments or to "take any other action consistent with the terms of the Indenture that the Collateral Manager reasonably believes to be in the best interests of the Noteholders."

29.    Because the Collateral Manager derives these powers from the issuer *and* its assigns, its powers include any rights that the Triaxx CDOs hold in the collateral *or* that they may have transferred to the trustees under the Indentures.

30.    Under Section 2 of the CMAs, Triaxx Asset Management LLC has broad powers to address the collateral in a variety ways: it can sell or dispose of the collateral; it can consent to modifications in the underlying collateral instruments; and it can retain counsel to assist in the renegotiation, documentation, or restructuring of the collateral.

31.    In particular, Triaxx Asset Management LLC has the right to bring litigation.  Section 2(d) of the CMAs says that Triaxx Asset Management LLC shall "exercise any other rights or remedies with respect to such Collateral Debt Security, Equity Security or Eligible Investment as provided in the related Underlying Instruments or take any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders."

32.    Underscoring this power, the last paragraph of Section 2 of the CMAs appoints Triaxx Asset Management LLC as the agent in fact of the Triaxx CDOs and their assigns (which in the CMAs are defined together as the "Issuer") and provides them "with full power of substitution and

full authority in the Issuer's name, place and stead and without any necessary further approval of the Issuer," including the power to take any actions specified in Section 2(d).

33.    Further, the powers and role of Triaxx Asset Management LLC are specifically contemplated in the Indentures.  The Indentures list the Collateral Manager as a "secured party" (in the preliminary statement) and as one of the agreements' "third party beneficiaries" (Section 14.9), and the Indentures refer repeatedly to the Collateral Manager.  The Indentures similarly rely on the terms of the Collateral Management Agreements—executed copies of which are required for issuance of the notes pursuant to Section 3.1(g)—to provide guidance for the operation of the Triaxx CDOs.

34.    Thus, when the Indentures and Collateral Management Agreements are read together, they form a consistent agreement:  while the trustees received an assignment from the Triaxx CDOs, the Indentures and Collateral Management Agreements contemplate that the Collateral Manager will exercise rights related to the collateral, including enforcing rights or remedies with respect to the Collateral, on behalf of the Triaxx CDOs or the trustees.

## II.    Residential Mortgage-Backed Securities

35.    The certificates that Ocwen damaged by its conduct are a kind of asset-backed security known as residential mortgage-backed securities ("RMBS").

36.    Issuers of asset-backed securities distribute risk as well as returns to investors by pooling cash-producing financial assets, such as mortgage loans, and then issuing securities backed by the pool of underlying assets.

37.    A common form of securitization of residential mortgage loans involves a sponsor and the creation of a trust, like the Trusts here, to which the sponsor sells a portfolio of mortgage loans. In many instances, the transfer of assets to a trust "is a two-step process: the financial assets are

transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, SEC Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1,506, 1,511 (Jan. 7, 2005).

38.    After receiving the portfolio of residential mortgage loans, the trust will issue RMBS using the pool of residential mortgage loans as collateral.  By purchasing those securities, known as certificates, investors acquire rights to the cash flowing from the pool of residential mortgage loans owned by the trust.  This cash is generated by borrowers' payments of principal and interest on the mortgage loans held by the trust.  *Id.* at 1,535, 1,537.  The trustee of the trust holds this cash and the mortgage loans on behalf of and for the benefit of investors (the certificateholders), as is the case with the Trusts at issue.[2]

39.    The servicer collects borrowers' payments of principal and interest on the residential mortgage loans.  The servicer also manages the trust's pool of residential mortgage loans.  In carrying out its duties, the servicer may waive or modify the terms, fees, penalties, or payments on the residential mortgage loans, particularly in handling delinquencies and losses on borrowers' payments.  *Id.* at 1,535.

---

[2] *See, e.g.*, RALI 2005-QS11 PSA § 2.01(a) ("The Company . . . does hereby assign to the Trustee for the benefit of the Certificateholders without recourse all the right, title and interest of the Company in and to the Mortgage Loans, including all interest and principal received on or with respect to the Mortgage Loans after the Cut-off Date . . . ."); RFMSI 2007-S4 PSA § 2.01(a) (same); RAST 2007-A1 PSA § 2.06 ("The Trustee acknowledges the transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, has executed and delivered to or upon the order of the Depositor, the Certificates in authorized denominations evidencing directly or indirectly the entire ownership of the Trust Fund.  The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates.").

40.    The servicer is often the primary party responsible for calculating the flow of funds for the trust, preparing distribution reports and disbursing funds to the trustee, who in turn uses the allocations provided by the servicer to distribute funds to security holders.  It is possible for a trust to have multiple servicers.  *Id.*

41.    A trust may also have a master servicer, which oversees the actions of other servicers (if they exist), and may also perform the aforementioned collection, management, allocation, and distribution functions.  *Id.*

42.    The trustee of the trust authorizes and empowers the servicer and subservicer to manage the trust's pool of residential mortgage loans and furnishes any powers of attorney necessary to do so.[3]

43.    Servicers hold themselves out as professionals and there are established industry standards that servicers should meet and on which they should train their professionals.  *See, e.g.,* Fannie Mae, *Servicing Guide: Fannie Mae Single Family* (2015) (noting that "servicers must exercise sound and professional judgment as mortgage loan servicers in the performance of their duties").

44.    In this case, Ocwen is the responsible servicer for each Trust, either as Servicer or as Master Servicer.[4]

---

[3] *See, e.g.*, RALI 2005-QS11 PSA § 3.01(a) ("Without limiting the generality of the foregoing, the Master Servicer in its own name or in the name of a Subservicer is hereby authorized and empowered by the Trustee when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment, to [carry out various actions].  . . . .  The Trustee shall furnish the Master Servicer with any powers of attorney and other documents necessary or appropriate to enable the Master Servicer to service and administer the Mortgage Loans."); RFMSI 2007-S4 PSA § 3.01(a) (same).

[4] *See, e.g.*, RALI 2005-QS11 PSA § 3.04 ("Notwithstanding any Subservicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Master Servicer or a Subservicer or reference to actions taken through a Subservicer or otherwise, the Master Servicer shall remain obligated and liable to the Trustee and the Certificateholders for the

### III.    The Relevant Contracts Related to Ocwen's Breaches

45.    The contracts that Ocwen breached are the PSAs, which govern each of the Trusts, and other agreements and related documents, such as servicing guides, that set the servicing standards to which Ocwen was obligated to adhere (the "Contracts").

46.    As alleged in more detail below, the PSAs and Contracts imposed on Ocwen the obligations to properly service the Mortgage Loans, which make up substantially all of the Trusts' assets.

47.    Although Ocwen is not an original party to the PSAs or the relevant Contracts, it has assumed the relevant obligations under each of the PSAs and the relevant Contracts as part of the process of acquiring the rights to service the Mortgage Loans and becoming the servicer for the Trusts.

48.    With regard to the RALI/RFMSI Trusts, Ocwen assumed the relevant obligations as part of an acquisition of the servicing rights for those Trusts in bankruptcy proceedings involving the predecessor servicers.  Ocwen assumed the obligations through a court order and an asset-purchase agreement: (i) a November 21, 2012 order that was entered in *In re: Residential Capital, LLC, et al.*, Case No. 12-12020 (Bankr. S.D.N.Y.), titled Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II)

---

servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer or the Company and to the same extent and under the same terms and conditions as if the Master Servicer alone were servicing and administering the Mortgage Loans."); RFMSI 2007-S4 PSA § 3.04 (same).

Granting Related Relief (the "November 21, 2012 Order"), and (ii) an Asset Purchase Agreement, dated as of November 2, 2012, entered into between Ocwen, and Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, GMACM Borrower LLC, and RFC Borrower LLC.[5]

49.    With regard to the RAST Trust, Ocwen assumed the relevant obligations under that Trust's PSA and the relevant Contracts as part of its acquisition of the servicing rights for that Trust from OneWest Bank, FSB, through a Mortgage Servicing Rights Purchase and Sale Agreement, dated June 13, 2013, entered into by and between OneWest Bank, FSB, and Ocwen.

50.    The breaches of contractual and extra-contractual duties at issue relate to activities during the time period in which Ocwen was the Servicer or Master Servicer for the Mortgage Loans, and took place between 2013 and the present.

51.    The PSAs and the Contracts also set out how payments and fees collected by the Servicer or Master Servicer in connection with the Mortgage Loans will pass through the Trusts to the Certificateholders.   After collecting the payments and fees, the Servicer or Master Servicer ultimately deposits the funds into an account which the Servicer, Master Servicer, Trustee, or

---

[5] For the avoidance of doubt, notwithstanding anything else in this complaint, Triaxx does not assert any claims against Ocwen that are barred by the November 21, 2012 Order.

paying agent uses to make payments to Certificateholders.[6]  The PSAs establish the order in which

different Certificateholders must be paid, commonly referred to as the "waterfall."[7]

---

[6] *See, e.g.*, RALI 2005-QS11 PSA § 3.07(b) ("The Master Servicer shall establish and maintain a Custodial Account in which the Master Servicer shall deposit or cause to be deposited . . . the following payments and collections remitted by Subservicers or received by it in respect of the Mortgage Loans subsequent to the Cut-off Date . . . (i) All payments on account of principal . . . (ii) All payments on account of interest . . . (iii) Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds . . . ."); RFMSI 2007-S4 PSA § 3.07(b) (same); RAST 2007-A1 PSA § 3.06(d) ("The Servicer shall establish and maintain a Certificate Account into which the Servicer shall deposit . . . the following payments and collections received by it in respect of Mortgage Loans after the Cut-off Date . . . (i) all payments on account of principal on the Mortgage Loans . . . (ii) all payments on account of interest on the Mortgage Loans . . . (iii) all Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds . . . ."); RAST 2007-A1 PSA § 3.06(e) ("The Trustee shall establish and maintain the Distribution Account on behalf of the Certificateholders.  The Trustee shall, promptly upon receipt, deposit in the Distribution Account and retain in the Distribution Account the following: (i) the aggregate amount remitted by the Servicer to the Trustee pursuant to Section 3.09(a) . . . ."); RAST 2007-A1 PSA § 3.09(a) ("The Servicer may (and in the case of clause (ix) below, shall) from time to time make withdrawals from the Certificate Account for the following purposes . . . (ix) by the Distribution Account Deposit Date, to withdraw the Available Funds and the Trustee Fee for the Distribution Date, to the extent on deposit, and remit such amount to the Trustee for deposit in the Distribution Account . . . .").

[7] *See, e.g.*, RALI 2005-QS11 PSA § 1.01 ("Available Distribution Amount: As to any Distribution Date . . . the sum of (i) the amount relating to the Mortgage Loans on deposit in the Custodial Account . . . ."); ("RALI 2005-QS11 PSA Series Supplement § 4.02 ("(a) On each Distribution Date the Master Servicer on behalf of the Trustee (or the Paying Agent appointed by the Trustee) shall distribute to the Master Servicer . . . and to each Certificateholder of record . . . the following amounts, in the following order of priority . . . in each case to the extent of the Available Distribution Amount . . . ."); RFMSI 2007-S4 PSA § 1.01 ("Available Distribution Amount: As to any Distribution Date . . . the sum of (i) the amount relating to the Mortgage Loans on deposit in the Custodial Account . . . .");  RFMSI 2007-S4 PSA Series Supplement § 4.02 ("(a) On each Distribution Date, (x) the Master Servicer on behalf of the Trustee or (y) the Paying Agent appointed by the Trustee, shall distribute (I) to the Master Servicer or a sub-servicer . . . and (II) to each Certificateholder of record . . . the following amounts, in the following order of priority . . . in each case to the extent of the Available Distribution Amount . . . ."); RAST 2007-A1 PSA § 4.02 ("(a)(1) On each Distribution Date, the Trustee shall withdraw any Available Funds from the Distribution Account and apply such funds to distributions on the Senior Certificates in the following order and priority, and in each case, to the extent of Available Funds remaining . . . .").

16

## IV.     Triaxx's Compliance with the PSAs' No-Action Clauses

52.     To the extent applicable, Triaxx has complied with all of the requirements to file suit against Ocwen under the PSAs.

53.     Section 11.03(c) of the PSAs for the RALI/RFMSI Trusts provides the following: "No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates of any Class evidencing in the aggregate not less than 25% of the related Percentage Interests of such Class, shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding . . . ."

54.     Section 10.08 of the PSA for the RAST Trust contains a comparable provision: "No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as provided in this Agreement, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred

17

therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding . . . ."

55.   In short, these provisions require that:  (i) the holder give notice of a default and its continuance; (ii) holders representing 25% of the Percentage Interests in a class of certificates (in the case of the RALI/RFMSI Trusts) or 25% of the Voting Rights of all certificates (in the case of the RAST Trust) (a) request in writing that the Trustee of the Trust commence the action in its own name as Trustee and (b) offer the Trustee a reasonable indemnity to do so; and (iii) the Trustee, for 60 days after receiving the notice, request to litigate, and offer of indemnity, neglects or refuses to commence the action.

56.   Triaxx has satisfied each of these requirements.

57.   On April 19, 2016, Triaxx sent by registered mail to each of the required recipients a notice of Ocwen's material breaches of its covenants in each of the PSAs (the "Breach Notice"). Under the PSAs, if Ocwen failed to cure these breaches within a certain time after receiving the Breach Notice (30 days for the RALI/RFMSI Trusts and 60 days for the RAST Trust), there would occur an Event of Default, as defined in the PSAs.

58.   On information and belief, Ocwen and the other required recipients received the Breach Notice by no later than May 2, 2016.

59.   On May 2, 2016, Triaxx also sent by registered mail to each of the required recipients a letter clarifying that the Breach Notice does not seek to pursue in any way claims that would be enjoined by: (i) the bankruptcy proceedings of the predecessor servicers, specifically the November 21, 2012 Order, or (ii) any other court order (together with the November 21, 2012 Order, the "Orders").  Similarly, the letter clarified that to the extent that the Orders hold that

Ocwen did not assume liability for the prior acts of debtors (*see, e.g.*, Section 23 of the November 21, 2012 Order), the Breach Notice did not seek to pursue claims based on that liability.

60.     By the time that 60 days had elapsed from May 2, 2016, i.e. by July 1, 2016, Ocwen had failed to cure any of the breaches that the Breach Notice identified, meaning that an Event of Default existed for each of the Trusts under the PSAs.

61.     On July 5, 2016, Triaxx sent by registered mail a notice to all the required recipients that an Event of Default existed and was continuing as to the Trusts.  On the same day, Triaxx, as a holder of 25% of the class interests or 25% of the total voting rights in each of the Trusts, as applicable, also made a written request, by registered mail, to the Trustee of the Trusts to commence an action against Ocwen to seek relief for the breaches outlined in the Breach Notice and any other breaches (the "Direction").  Triaxx included in the Direction an offer to the Trustee of a reasonable indemnity to commence the action (the "Indemnity," together with the Direction, the "Direction and Indemnity").

62.     On information and belief, the Trustee received Triaxx's notice of the existence of an Event of Default as well as Triaxx's Direction and Indemnity by no later than July 13, 2016.

63.     The Trustee had significantly longer than 60 days from receiving the Direction and Indemnity and either refused or neglected to commence an action.  Accordingly, Triaxx had the right to commence an action itself and exercised that right by the filing of this suit.

64.     On November 15, 2016, Triaxx as a holder of 25% of the class interests or 25% of the total voting rights in each of the Trusts, as applicable, again offered, by registered mail, to the Trustee a reasonable indemnity to commence the action Triaxx had requested, which was in addition to the already existing offer of reasonable indemnity the Trustee had received by July 13, 2016 (the "Additional Indemnity").

19

65.    On information and belief, the Trustee received Triaxx's Additional Indemnity by no later than November 22, 2016.

66.    The Trustee had significantly longer than 60 days from receiving the Additional Indemnity and either refused or neglected to commence an action.  This further evidences that Triaxx had the right to commence an action itself and exercised that right by the filing of this suit.

## V.    Ocwen's Breach of Its Duty to Properly Service the Trusts' Mortgage Loans

67.    In failing to properly service the Mortgage Loans, Ocwen breached, among other things, its obligations under Article III of the PSAs related to the Administration and Servicing of Mortgage Loans and other applicable Contracts.  Ocwen also breached its extra-contractual duties to avoid conflicts of interest and to perform ministerial acts with due care.

68.    Article III of the PSAs sets out the standards under which Ocwen had to service the Mortgage Loans for and on behalf of the Certificateholders.[8]  Section 3.01 of the PSAs requires

---

[8] *See, e.g.*, RALI 2005-QS11 PSA § 2.03(a) ("The Master Servicer hereby represents and warrants to the Trustee for the benefit of the Certificateholders that . . . (iii) This Agreement, assuming due authorization, execution and delivery by the Trustee and the Company, constitutes a valid, legal and binding obligation of the Master Servicer . . . ."); RALI 2005-QS11 PSA § 3.01(a)  ("The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement . . . .  [T]he Master Servicer . . . is hereby authorized and empowered by the Trustee . . . to execute and deliver, on behalf of the Certificateholders and the Trustee or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, or of consent to assumption or modification . . . with respect to the Mortgage Loans and with respect to the Mortgaged Properties."); RFMSI 2007-S4 PSA § 2.03(a) ("The Master Servicer hereby represents and warrants to the Trustee for the benefit of the Certificateholders that . . . (iii) This Agreement, assuming due authorization, execution and delivery by the Trustee and the Company, constitutes a valid, legal and binding obligation of the Master Servicer . . . ."); RFMSI 2007-S4 PSA § 3.01(a) ("The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement . . . .  [T]he Master Servicer . . . is hereby authorized and empowered by the Trustee . . . to execute and deliver, on behalf of the Certificateholders and the Trustee or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, or of consent to assumption or modification . . . with respect to the Mortgage Loans and with respect to the Mortgaged Properties."); RAST 2007-A1 PSA § 3.01 ("For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with this Agreement and the Servicing Standard. . . . [T]he Servicer

Ocwen, as Servicer or Master Servicer, to service and administer the Mortgage Loans in accordance with the terms of the PSAs: for example, Ocwen is required to service and administer the Mortgage Loans by following such procedures as the servicer would employ in good-faith business judgment and which are normal and usual in its general mortgage servicing activities, and with the same degree of skill and care exercised by the servicer with respect to mortgage loans comparable to the mortgage loans serviced by the servicer for itself or others.

69.   Article III of the PSAs also requires that Ocwen do all of the following: (i) "make reasonable efforts" to "collect all payments" called for under the Mortgage Loans; (ii) foreclose on the properties securing defaulted Mortgage Loans "as to which no satisfactory arrangements can be made for collection of delinquent payments"; and (iii) reimburse itself for certain expenses, including servicing advances, only in accordance with the PSAs.

---

. . . is hereby authorized and empowered by the Depositor and Trustee . . . to execute and deliver, on behalf of the Trustee, the Depositor, the Certificateholders, or any of them, any instruments of satisfaction or cancellation . . . for the benefit of the Certificateholders.").

70.     Ocwen's servicing obligations owed to the Certificateholders are detailed in many other provisions of the PSAs.[9]

---

[9] *See, e.g.*, RALI 2005-QS11 PSA § 3.14(c) ("If the Trust fund acquires any REO Property as aforesaid or otherwise in connection with a default or imminent default on a Mortgage Loan, the Master Servicer on behalf of the Trust fund shall dispose of such REO Property as soon as practicable, giving due consideration to the interests of the Certificateholders . . . ."); RFMSI 2007-S4 PSA § 2.04 ("The Master Servicer shall amend . . . the Mortgage Loan Schedule . . . for the benefit of the Certificateholders to reflect the removal of such Deleted Mortgage Loan . . . ."); RFMSI 2007-S4 PSA § 3.02(b) ("As part of its servicing activities hereunder, the Master Servicer, for the benefit of the Trustee and the Certificateholders, shall use its best reasonable efforts to enforce the obligations of each Subservicer . . . ."); RFMSI 2007-S4 PSA § 3.12(a) ("If the Master Servicer shall obtain and maintain a blanket fire insurance policy . . . . [T]he Master Servicer agrees to present, on behalf of itself, the Trustee and the Certificateholders, claims under any such blanket policy."); RFMSI 2007-S4 PSA § 3.14(a) ("[T]he Master Servicer shall perform its obligations under the Credit Support Pledge Agreement . . . in a manner that is in the best interests of the Certificateholders."); RFMSI 2007-S4 PSA § 3.14(c) ("If the Trust Fund acquires any REO Property as aforesaid or otherwise in connection with a default or imminent default on a Mortgage Loan, the Master Servicer on behalf of the Trust Fund shall dispose of such REO Property as soon as practicable, giving due consideration to the interests of the Certificateholders . . . ."); RFMSI 2007-S4 PSA § 3.15(a) ("The Master Servicer is authorized . . . to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of satisfaction or cancellation or of partial or full release."); RFMSI 2007-S4 PSA § 6.03 ("[T]he Master Servicer may in its discretion undertake any such action . . . it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder."); RAST 2007-A1 PSA § 2.03(c) ("The Servicer shall amend the Mortgage Loan Schedule for the benefit of the Certificateholders to reflect the removal of the Deleted Mortgage Loan . . . ."); RAST 2007-A1 PSA § 3.01 ("[T]he Servicer . . . is hereby authorized and empowered . . . to execute and deliver, on behalf of the Trustee, the Depositor, the Certificateholders, or any of them, any instruments of satisfaction or cancellation . . . for the benefit of the Certificateholders."); RAST 2007-A1 § 3.06(a) ("In connection with a seriously delinquent or defaulted Mortgage Loan, the Servicer may . . . modify or vary any term of that Mortgage Loan . . . if in the Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders . . ."); RAST 2007-A1 § 3.10(a) ("The Servicer shall maintain, for each Mortgage Loan, hazard insurance . . . .  In connection with its activities as Servicer . . . the Servicer agrees to present, on behalf of itself, the Depositor, and the Trustee for the benefit of the Certificateholders, claims under any blanket policy."); RAST 2007-A1 § 3.13(a) ("The Servicer is authorized . . . to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of satisfaction or cancellation or of partial or full release."); RAST 2007-A1 § 3.14(a) ("The Servicer also agrees that it shall not create, incur or subject any Mortgage File . . . or any funds that otherwise are or may become due or payable to the Trustee for the benefit of the Certificateholders, to any claim . . . except, however, that the Servicer shall be entitled to set off against and deduct any such funds any amounts that are properly due and payable to the Servicer under this Agreement.").

71.   In violation of its obligations under the applicable PSAs, including without limitation Sections 3.01,[10] 3.06,[11] 3.07,[12] 3.09,[13] 3.10,[14] 3.12,[15] and 3.14,[16] as applicable, or under other

---

[10] *See, e.g.*, RALI 2005-QS11 PSA § 3.01(a) ("The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement . . . . [T]he Master Servicer shall, to the extent not inconsistent with this Agreement, comply with the Program Guide as if it were the originator of such Mortgage Loan and had retained the servicing rights and obligations in respect thereof."); RFMSI 2007-S4 PSA § 3.01(a) ("The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement . . . following such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities . . . .); RAST 2007-A1 PSA § 3.01 ("For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with this Agreement and the Servicing Standard.").

[11] *See, e.g.*, RAST 2007-A1 PSA § 3.06(a) ("In accordance with and to the extent of the Servicing Standard, the Servicer shall make reasonable efforts in accordance with the customary and usual standards of practices of prudent mortgage servicers to collect all payments called for under the Mortgage Loans to the extent the procedures are consistent with this Agreement . . . .").

[12] *See, e.g.*, RALI 2005-QS11 PSA § 3.07(a) ("The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement . . . follow such collection procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities."); RFMSI 2007-S4 PSA § 3.07(a) (same).

[13] *See, e.g.*, RAST 2007-A1 PSA § 3.09(a) ("The Servicer may . . . from time to time make withdrawals from the Certificate Account . . . (v) to reimburse the Servicer for (a) unreimbursed Servicing Advances . . . and (b) for unpaid Servicing Fees . . . .").

[14] *See, e.g.*, RALI 2005-QS11 PSA § 3.10(a) ("The Master Servicer may, from time to time as provided herein, make withdrawals from the Custodial Account of amounts on deposit therein . . . (ix) to reimburse itself for Servicing Advances expended by it (a) pursuant to Section 3.14 in good faith in connection with the restoration of property damaged by an Uninsured Cause, and (b) in connection with the liquidation of a Mortgage Loan or disposition of an REO Property to the extent not otherwise reimbursed . . . ."); RFMSI 2007-S4 PSA § 3.10(a) (same).

[15] *See, e.g.*, RAST 2007-A1 PSA § 3.12 ("The Servicer shall use reasonable efforts in accordance with the Servicing Standard to foreclose on or otherwise comparably convert the ownership of assets securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.").

[16] *See, e.g.*, RALI 2005-QS11 PSA § 3.14(a) ("The Master Servicer shall foreclose upon or otherwise comparably convert . . . the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments . . . ."); RFMSI 2007-S4 PSA § 3.14(a) (same).

applicable Contracts, Ocwen has, among other things, breached its obligations in the following ways:

    a) *Improper loan modifications*.  Ocwen improperly modified Mortgage Loans, including by excessively reducing Mortgage Loan balances.

    b) *Improper liquidation*.  Ocwen improperly liquidated mortgage properties, including by charging excessive liquidation costs or by accepting unduly low liquidation prices.

    c) *Additional Unexplained Loss*.  Likely as a result of improper servicing, the booked loss on Mortgage Loans was in excess of what would be expected in light of the Mortgage Loans' liquidation proceeds, allowed servicing advances, and reasonable liquidation costs.

    d) *Unreasonably long delinquency*.  Ocwen allowed Mortgage Loan delinquencies to continue without resolution for unduly long time periods, saddling the Trusts with the expenses of continuing to carry those Mortgage Loans, and at the same time enriching Ocwen by allowing it to charge unwarranted servicing fees on mortgages which should have been liquidated.

    e) *Failed foreclosures*.  Ocwen repeatedly failed in its attempts to foreclose on Mortgage Loans, likely because servicing or documentation deficiencies prevented foreclosure.

    f) *Failed REO disposition*.  Mortgage properties that became REO properties reverted to non-REO status, likely because of improper servicing or documentation deficiencies.  REO refers to "real estate owned," i.e. properties owned by the Trust after foreclosure proceedings. The fact that an REO property becomes non-REO indicates that the foreclosure was ineffective.

72.    The PSAs contain provisions that purport to limit the Servicer's and Master Servicer's liability to the Trust and Certificateholders under the PSAs to circumstances where the servicer acted with gross negligence or worse.[17]  For the reasons discussed below, Ocwen's breaches were,

---

[17] *See, e.g.,* RALI 2005-QS11 PSA § 6.03 ("Neither the Company, the Master Servicer nor any of the directors, officers, employees or agents of the Company or the Master Servicer shall be under any liability to the Trust Fund or the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect . . . the Master Servicer or any such Person against . . . any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of

at the very least, grossly negligent, such that Ocwen can be held accountable and directly liable to the Certificateholders for its deficient conduct.  As described below, Ocwen's breaches were widespread across the Mortgage Loans that Ocwen was servicing, and Ocwen repeatedly failed to adhere to even minimal standards of servicing for thousands of loans.  Notwithstanding that Ocwen had access to all the information it needed to properly service the loans—such as loan files, property value information, delinquency data, and other information—the data and evidence demonstrates that Ocwen committed rampant breaches of its servicing obligations, ignored its contractual obligations, including those owed to the Certificateholders, and disregarded known or obvious risks in servicing the loans.  Ocwen's conduct did not just violate its contractual obligations, but was also grossly negligent given that Ocwen failed to adhere to minimal servicing standards or to verify basic and critical information about the Mortgage Loans.  Upon information and belief, discovery will show still further evidence of Ocwen's gross negligence or reckless disregard of its obligations.

73.    Ocwen also breached its extra-contractual duty to perform ministerial acts with due care and violated its extra-contractual duty to avoid conflicts of interest that enrich it at the expense of the Certificateholders, including Triaxx.  For example, by using affiliated parties to conduct foreclosure sales, Ocwen enriched itself at the expense of both homeowners and Certificateholders. Upon information and belief, discovery will show further evidence that Ocwen's conduct violated

---

obligations and duties hereunder."); RFMSI 2007-S4 PSA § 6.03 (same); RAST 2007-A1 PSA § 6.03 ("None of the Depositor, the Seller, the Servicer or any of the directors, officers, employees or agents of the Depositor, the Seller or the Servicer shall be under any liability to the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however that this provision shall not protect . . . the Servicer or any such Person from any liability which would otherwise be imposed by reasons of willful misfeasance, bad faith or gross negligence in the performance of duties or because of reckless disregard of obligations and duties hereunder.").

its duty to perform ministerial acts with due care and created conflicts of interest, including by allowing it to collect fees and other funds from the Trusts that it would not have otherwise received by, among other things, improperly delaying action on delinquent loans, charging excessive liquidation costs, and conducting failed foreclosures.

A.  *Ocwen's Violations Are Confirmed by the Loan Review*

74.   Ocwen's servicing violations are confirmed by an analysis of the Mortgage Loans that Triaxx has undertaken (the "Loan Review").  The Loan Review was conducted using servicing remittance reports and an automated valuation model ("AVM") based on a variety of available data.

75.   The AVM utilized mathematical modeling to calculate a Mortgage Loan property's fair value at a specific point in time by looking at the values of a set of comparable properties that is algorithmically compiled from a vast database of actual U.S. real estate transactions.  The Loan Review then used the calculated fair value of the property to ascertain, among other things, whether Ocwen as servicer liquidated the property at a fair price or reduced the Mortgage Loan balance by a reasonable amount (as part of a modification) relative to the value of the property—or whether, as turned out to be the case in many instances, the property was liquidated at an unreasonably low price or the Mortgage Loan balance was reduced by an unreasonably large amount.

76.   The AVM's calculation of a Mortgage Loan property's value involved a two-step process. First, the AVM identified the particular property collateralizing a Mortgage Loan, which it did by matching up available information about the Mortgage Loan property with records about a vast number of properties collected in a database.  The AVM's algorithm matched properties using key characteristics such as origination date, loan purpose, loan-to-value ratio ("LTV"), combined loan-to-value ratio ("CLTV"), date of foreclosure, date of becoming REO, servicer name, and trust

name, among other factors.  This matching process drew on a database that included (i) more than 100 million residential property assessor records, (ii) more than one billion real estate transactions (including sales and mortgage transactions), (iii) origination loan tapes with more than 7,000 non-agency RMBS trusts, (iv) more than one billion rows of loan remittance records (including delinquency, foreclosure, and REO actions), and (v) financial data for more than 125 million consumers (including asset, income, debt, and debt servicing records).

77.    After a Mortgage Loan property was identified through the matching process, the AVM identified comparable properties (with similar characteristics) whose values would be expected to be comparable.  The AVM then calculated the fair market value of the Mortgage Loan property by reference to the values of the comparable properties.

B.  *Ocwen's Improper Loan Modifications*

78.    In the wake of the financial crisis, the value of many properties around the country declined dramatically, often well below the outstanding principal amount of the mortgage loans that those properties secured.  In those situations, servicers like Ocwen sometimes responded by modifying the loans downward, thus forgiving part of the outstanding principal.  In doing so, however, servicers were obligated to keep sight of their obligations to certificateholders, who earned a return on their investment by receiving income from the loans.  For many of the modifications related to the Mortgage Loans, Ocwen failed to meet its obligations to the certificateholders.

79.    The Loan Review revealed that at least 202 Mortgage Loans, with an aggregate original balance of $63,854,529, were modified improperly, including modifications that reduced principal.  The Loan Review demonstrated that these 202 Mortgage Loans were modified to less—and sometimes much less—than 105% of the mortgaged property's fair value based on comparable

transactions. Reducing loans to less than 105% of the mortgaged property's fair value is problematic because it improperly ignores the interests of Certificateholders in favor of home buyers, as it reduces the income from the loans.

80. To properly service a loan, the correct balance must be struck between the interests of the Certificateholders and the interests of the home owners. Ocwen repeatedly failed to do that in breach of its servicing obligations. Ocwen's practices were contrary to industry standards and federal guidelines related to loan modifications, which is strong evidence that Ocwen failed to mitigate losses in accordance with prudent mortgage loan servicing practices.

81. For example, the Home Affordable Modification Program ("HAMP") is designed to help financially struggling homeowners avoid foreclosure by modifying loans to a level that is affordable for borrowers now and is sustainable over the long term. The program provides clear and consistent loan modification guidelines that the entire mortgage industry can use. Essentially, the guidelines aim to have modifications that maximize the net present value of a mortgage loan. HAMP guidelines for certain eligible loans direct servicers to "reduce the UPB [Unpaid Principal Balance] by an amount necessary to achieve either (i) the target monthly mortgage payment ratio of 31% of the borrower's income or (ii) a MTMLTV [Mark-to-Market Loan-to-Value] ratio equal to 115%, whichever is reached first. Servicers are allowed to reduce principal below 31% DTI [Debt to Income] or below 115% MTMLTV, however, principal reductions that bring the MTMLTV below 105% will only receive incentives on principal reductions down to 105%." Thus, generally, if a servicer reduces the principal balance of a loan to below 105% of the fair market value of the property securing the loan, that reduction is in excess of what the HAMP guidelines deem appropriate.

82.     The excessive forgiveness of principal in a Mortgage Loan is harmful to a Trust and the Certificateholders, including Triaxx, because it reduces the amount of money that is due to the Trust further than is necessary, thus reducing the income to Certificateholders.  Ocwen's breaches in this regard materially and adversely affected the interests of the Certificateholders.

83.     The following are examples of improper modifications:

a)      <u>Mortgage Loan No. -----2323:</u> On September 25, 2014, Ocwen improperly modified Mortgage Loan No. -----2323 from RAST 2007-A1 to $457,642, despite the fact that the fair market value of the mortgage property at that time was $1,100,370.  Ocwen's excessive forgiveness of the Mortgage Loan resulted in a modified note balance that was just 41.6% of the fair market value of the mortgage property, materially and adversely affecting the interests of the Certificateholders.

b)      <u>Mortgage Loan No. ----9587:</u> On January 25, 2015, Ocwen improperly modified Mortgage Loan No. ----9587 from RALI 2006-QS16 to $439,450, despite the fact that the fair market value of the mortgage property at that time was $573,288.  Ocwen's excessive forgiveness of the Mortgage Loan resulted in a modified note balance that was just 76.7% of the fair market value of the mortgage property, materially and adversely affecting the interests of the Certificateholders.

c)      <u>Mortgage Loan No. ----6105:</u> On October 25, 2015, Ocwen improperly modified Mortgage Loan No. ----6105 from RALI 2007-QS1 to $316,185, despite the fact that the fair market value of the mortgage property at that time was $1,432,014.  Ocwen's excessive forgiveness of the Mortgage Loan resulted in a modified note balance that was just 22.1% of the fair market value of the mortgage property, materially and adversely affecting the interests of the Certificateholders.

d) <u>Mortgage Loan No. ----1629:</u> On November 25, 2014, Ocwen improperly modified Mortgage Loan No. ----1629 from RALI 2007-QS1 to $403,642, despite the fact that the fair market value of the mortgage property at that time was $568,254. Ocwen's excessive forgiveness of the Mortgage Loan resulted in a modified note balance that was just 71% of the fair market value of the mortgage property, materially and adversely affecting the interests of the Certificateholders.

e) <u>Mortgage Loan No. ----2301:</u> On September 25, 2015, Ocwen improperly modified Mortgage Loan No. ----2301 from RFMSI 2007-S4 to $414,017, despite the fact that the fair market value of the mortgage property at that time was $708,169. Ocwen's excessive forgiveness of the Mortgage Loan resulted in a modified note balance that was just 58.5% of the fair market value of the mortgage property, materially and adversely affecting the interests of the Certificateholders.

84. Moreover, by modifying loans that should have been foreclosed upon, Ocwen gave itself the ability to continue to charge fees on those loans, thereby placing its own interests above those of the Certificateholders.

85. The large number, and amount, of these excessive reductions caused direct harm to the interests of the Certificateholders, including Triaxx, and demonstrate that Ocwen's conduct was, at the least, grossly negligent or reckless. Ocwen's conduct in this regard was not narrow, but widespread across the Mortgage Loans and Trusts at issue: Ocwen improperly modified hundreds of loans with an aggregate original loan balance of nearly $64 million and booked losses of over $27 million. Thus, Ocwen's improper loan modifications are not isolated instances but rather reflect a complete disregard by Ocwen for the duties that it owed as servicer.

30

C. *Ocwen's Improper Loan Liquidations*

86.    The Loan Review also evaluated mortgaged properties that had been liquidated by Ocwen, and analyzed public records to determine whether those liquidations were conducted in accordance with prudent mortgage loan servicing practices.  The Loan Review uncovered that Ocwen improperly liquidated the properties underlying at least 394 Mortgage Loans, with an aggregate original balance of $100,931,801, at more than 10% below each property's fair value based on comparable transactions.  Liquidating a mortgaged property for less than 90% of its fair value—resulting in a loss to the Trust of more than 10% of the property's fair value—is strong evidence that Ocwen failed to foreclose upon or dispose of the property in accordance with prudent mortgage loan servicing practices.  The use of a 90% threshold, rather than a 100% threshold, ensures that a liquidation below the threshold is in fact improper and not just a slight deviation from the fair market value of the mortgage property.

87.    Liquidating a mortgaged property for any amount less than its fair market value—let alone over 10% less—is harmful to Certificateholders because it unnecessarily reduces the amount of the proceeds that are paid into the Trust and thereby also the income to Certificateholders, including Triaxx.

88.    The following are examples of improper liquidations:

   a)    Mortgage Loan No. ---9519: On October 25, 2014, Ocwen improperly liquidated Mortgage Loan No. ---9519 from RAST 2007-A1 for $275,550, despite the fact that the fair market value of the mortgage property at that time was $1,179,871. Ocwen's acceptance of an unduly low liquidation price—just 23.4% of the fair market value of the property—materially and adversely affected the interests of the Certificateholders.

b) <u>Mortgage Loan No. ---2385:</u> On January 25, 2014, Ocwen improperly liquidated Mortgage Loan No. ---2385 from RALI 2005-QS9 for $900,000, despite the fact that the fair market value of the mortgage property at that time was $1,475,268. Ocwen's acceptance of an unduly low liquidation price—just 61% of the fair market value of the property—materially and adversely affected the interests of the Certificateholders.

c) <u>Mortgage Loan No. ----1541:</u> On February 25, 2015, Ocwen improperly liquidated Mortgage Loan No. ----1541 from RALI 2006-QS18 for $243,800, despite the fact that the fair market value of the mortgage property at that time was $413,359. Ocwen's acceptance of an unduly low liquidation price—just 59% of the fair market value of the property—materially and adversely affected the interests of the Certificateholders.

d) <u>Mortgage Loan No. ----9395:</u> On June 25, 2013, Ocwen improperly liquidated Mortgage Loan No. ----9395 from RALI 2006-QS18 for $351,100, despite the fact that the fair market value of the mortgage property at that time was $491,722. Ocwen's acceptance of an unduly low liquidation price—just 71% of the fair market value of the property—materially and adversely affected the interests of the Certificateholders.

e) <u>Mortgage Loan No. ----5601:</u> On June 25, 2015, Ocwen improperly liquidated Mortgage Loan No. ----5601 from RALI 2007-QS1 for $525,000, despite the fact that the fair market value of the mortgage property at that time was $616,876. Ocwen's acceptance of an unduly low liquidation price—just 85% of the fair

market value of the property—materially and adversely affected the interests of the Certificateholders.

f) <u>Mortgage Loan No. ----1217:</u> On August 25, 2014, Ocwen improperly liquidated Mortgage Loan No. ----1217 from RALI 2007-QS1 for $749,000, despite the fact that the fair market value of the mortgage property at that time was $1,137,852. Ocwen's acceptance of an unduly low liquidation price—just 66% of the fair market value of the property—materially and adversely affected the interests of the Certificateholders.

g) <u>Mortgage Loan No. ----5591:</u> On December 25, 2014, Ocwen improperly liquidated Mortgage Loan No. ----5591 from RFMSI 2007-S4 for $97,000, despite the fact that the fair market value of the mortgage property at that time was $138,950. Ocwen's acceptance of an unduly low liquidation price—just 70% of the fair market value of the property—materially and adversely affected the interests of the Certificateholders.

89.   In addition to liquidating loans well below their fair market value, as discussed in more detail below (*see* Section V.D below), Ocwen charged excessive fees related to liquidations, and in some cases used a related part that charged more than unrelated entities for the same work. By charging excessive costs for liquidations, Ocwen placed its own interests above those of the Certificateholders. Moreover, to the extent that Ocwen retained affiliates to conduct these improper liquidations, instead of hiring unrelated and more cost effective providers at arms'-length prices, Ocwen profited at the expense of the Certificateholders.

90.   The large number, and amount, of these improper liquidations caused direct harm to the interests of the Certificateholders, including Triaxx, and demonstrate that Ocwen's conduct was,

at the least, grossly negligent or reckless.  The fact that hundreds of loans with an aggregate original balance of over $100 million and booked losses of over $70 million were improperly liquidated shows that these are not isolated instances but rather reflect a widespread disregard by Ocwen of its duties as servicer.  These breaches had a material and adverse effect on the interests of the Certificateholders, including Triaxx.

*D.  Additional Unexplained Losses that Ocwen Improperly Booked*

91.    In addition, the Loan Review identified loans for which the booked loss on a Mortgage Loan was in excess of what would be expected in light of the Mortgage Loan's liquidation proceeds, allowed servicing advances, and reasonable liquidation costs.  Such unexplained, excessive losses likely resulted from improper servicing of the Mortgage Loans, such as the servicer's incurring excessive liquidation costs and then seeking reimbursement for those costs from the Trust, thereby driving up the loss on the Mortgage Loan.

92.    Upon liquidation, the booked loss on a Mortgage Loan should be equal to (i) the outstanding principal balance of the Mortgage Loan plus (ii) the reasonable expenses associated with servicing the loan (servicing advances and liquidation costs), for which the servicer may seek reimbursement from the Trust, less (iii) the proceeds from the liquidation of the Mortgage Loan. To the extent the booked loss is greater than this sum, the reasonable inference is that the servicer improperly charged excessive (instead of reasonable) expenses to the Mortgage Loan, such as unreasonably high liquidation costs.  In a consent order in another case, for example, Ocwen agreed to findings by an independent compliance monitor that Ocwen had been using a related party, Hubzu, to handle auctions, even though Hubzu charged Ocwen more than it did other customers,

as described further below.[18]  This use of a related party that charged more than it should have is a textbook example of the type of conflict of interest that Ocwen had a duty to avoid.

93.    The following are examples of Mortgage Loans for which there was an unexplained loss:

a)    Mortgage Loan No. ----1143: On October 25, 2013, Ocwen liquidated Mortgage Loan No. ----1143 from RALI 2006-QS16 for $500,000.  The loan balance at the time of liquidation was $507,318.  The servicing advance at liquidation and the liquidation costs were $31,390 and $50,000, respectively.  Subtracting the liquidation proceeds ($500,000) from the principal balance at the time of the liquidation ($507,318) and adding reasonable expenses (servicing advances and liquidation costs, totaling $81,390) yields $88,708 in losses.  However, the booked loss to the Trust was almost four times higher than $88,708, namely $331,354, which leaves $242,646 in unexplained loss.  This unexplained loss indicates that Ocwen engaged in improper servicing by charging excessive and unreasonable expenses to the Trust that materially and adversely affected the interests of the Certificateholders.

b)    Mortgage Loan No. ----7897: On January 25, 2015, Ocwen liquidated Mortgage Loan No. ----7897 from RFMSI 2007-S4 for $570,000.  The loan balance at the time of liquidation was $406,255.  The servicing advance at liquidation and the liquidation costs were $2,201 and $57,000, respectively.  Subtracting the liquidation proceeds ($570,000) from the principal balance at the time of the liquidation ($406,255) and adding reasonable expenses (servicing advances and

---

[18] *See* Consent Order, ¶ 22, Consent Order Pursuant to N.Y. Bank Law § 44, *In the Matter of Ocwen Fin. Corp., Ocwen Loan Servicing, LLC*.  Citations to "N.Y. Consent Order" are to this Consent Order.

liquidation costs, totaling $59,201) actually yields a *profit* of $104,544.  However, there was no profit reported, and instead there was a booked loss to the Trust of $165,488, meaning that the full amount of those losses was unexplained.  The unexplained loss indicates that Ocwen engaged in improper servicing by charging excessive and unreasonable expenses to the Trust that materially and adversely affected the interests of the Certificateholders.

94.    In total, the Loan Review uncovered that at least 397 Mortgage Loans, with an aggregate original balance of approximately $118 million and booked losses of over $78 million, had a booked loss that was in excess of what would be expected in light of the Mortgage Loan's liquidation proceeds, allowed servicing advances, and reasonable liquidation costs.

95.    For loans where the Trusts experienced booked losses in excess of what would be expected in light of the loans' liquidation proceeds, allowed servicing advances, and reasonable liquidation costs, Ocwen enriched itself at the expense of the Certificateholders.

96.    The number and amount of Mortgage Loans with these unexplained losses caused direct harm to the interests of the Certificateholders, including Triaxx, and demonstrate that Ocwen's conduct was, at the least, grossly negligent or reckless.  These are not isolated instances but rather reflect a complete disregard by Ocwen for the duties that it owed as servicer, which had a material and adverse effect on the Certificateholders, including Triaxx.

*E.  Ocwen's Failure to Timely Address Delinquencies*

97.    The Loan Review also examined Mortgage Loans that came into and remained in delinquency for an extended period of time and revealed that at least 1,200 Mortgage Loans with an aggregate original balance of $310,455,034 remained delinquent for six months or more—often much more—without any change in reported status showing servicer action.  That these Mortgage

Loans continued in delinquency for 180 days or more without servicer intervention shows that Ocwen did not properly service those Mortgage Loans in accordance with prudent mortgage loan servicing practices and industry standards.  One of the servicer's most fundamental duties is to take swift action to turn delinquent loans into performing loans or to liquidate them in order to restore income to the Trust.  By way of reference, the Fannie Mae Single Family Servicing Guide[19] and the rules of the Consumer Financial Protection Bureau (the "CFPB"),[20] which are important industry standards, allow servicers to take foreclosure steps after 120 days (~ four months) of delinquency.[21]

98.    Ocwen's failure to act on these delinquencies in a timely manner burdened the Trusts with the expense of carrying non-performing Mortgage Loans that should have been modified or liquidated.  Modifying the loan sooner could have allowed a homeowner to resume making loan payments, thereby maximizing value to the relevant Trust.  And liquidating the loan sooner could have brought the liquidation proceeds for the loans into the relevant Trust earlier, while eliminating the administrative cost of servicing the Mortgage Loan.  Instead, Ocwen allowed Mortgage Loans to fester in the Trusts unaddressed, which allowed it to continue to charge and pay itself fees related to those Mortgage Loans.

---

[19] In setting timeframes for key servicing milestones and determining what servicing practices are prudent, it is customary in the servicing industry to look to the requirements of the Federal National Mortgage Association ("Fannie Mae"), one of the largest players in the country's mortgage loan industry.  Ocwen financial statements note that Fannie Mae is an Ocwen servicing client.  *See* Ocwen Fin. Corp., Annual Report (Form 10-K), at 7 (Mar. 3, 2014).

[20] The CFPB implements and enforces federal consumer financial laws to ensure that all consumers have access to markets for consumer financial products and services that are fair, transparent, and competitive.

[21] *See, e.g.*, Fannie Mae Single Family 2015 Servicing Guide, Pt. E, Ch. 1, § 2-02 (effective Nov. 12, 2014), *available at* https://www.fanniemae.com/content/guide/svc011415.pdf; 12 C.F.R. § 1024.41(f)(1) (2013).

99.   For example, under the Contracts, Ocwen earns a Servicing Fee for each Mortgage Loan in the Trust as compensation.[22]  The Servicing Fee for each mortgage loan is payable out of the interest payments on that mortgage loan,[23] meaning that the more Mortgage Loans there are in a Trust, the more Ocwen earns.  Consequently, for every Mortgage Loan that Ocwen improperly left in delinquency, Ocwen could, and did, earn servicing fees with each passing month.

100.   The following are examples of Mortgage Loans with unreasonably long delinquencies:

    a)   <u>Mortgage Loan No. ----8630:</u> Starting from or about September 25, 2013, Ocwen allowed   Mortgage   Loan   No.   ----8630   from   RAST   2007-A1   to   remain   in

---

[22] *See, e.g.*, RALI 2005-QS11 Prospectus p. 79 ("Each servicer, the master servicer or the Certificate Administrator, as applicable, will be paid compensation for the performance of its servicing obligations at the percentage per annum described in the accompanying prospectus supplement of the outstanding principal balance of each mortgage loan or contract."); RFMSI 2007-S4 Prospectus p. 58 ("As compensation for its servicing duties, a subservicer or, if there is no subservicer, the master servicer will be entitled to a monthly servicing fee as described in the related prospectus supplement . . . ."); RAST 2007-A1 PSA § 3.15 ("As compensation for its activities hereunder, the Servicer may retain or withdraw from the Certificate Account the Servicing Fee for each Mortgage Loan for the related Distribution Date.").

[23] *See, e.g.*, RALI 2005-QS11 Prospectus Supplement p. 82 ("The servicing fees for each mortgage loan are payable out of the interest payments on that mortgage loan.  The servicing fees relating to each mortgage loan will be at least 0.280% per annum and not more than 0.870% per annum of the outstanding principal balance of that mortgage loan, with a weighted average servicing fee of approximately 0.3260% per annum as of the reference date. The servicing fees consist of (a) servicing fees payable to the master servicer . . . and (b) subservicing fees payable to the subservicer . . . ."); RFMSI 2007-S4 Prospectus Supplement p. S-78 ("The servicing fees for each mortgage loan are payable out of the interest payments on that mortgage loan prior to payments to certificateholders.  The servicing fees relating to each mortgage loan will be at least 0.28% per annum and not more than 0.80% per annum of the outstanding principal balance of that mortgage loan, with a weighted average servicing fee of approximately 0.3144% per annum as of the reference date. The servicing fees consist of (a) servicing compensation payable to the master servicer . . . and (b) subservicing and other related compensation payable to the subservicer . . . ."); RAST 2007-A1 PSA § 1.01 ("Servicing Fee: As to each Mortgage Loan and any Distribution Date, one month's interest at the applicable Servicing Fee Rate on the Stated Principal Balance of the Mortgage Loan, or, whenever a payment of interest accompanies a Principal Prepayment in Full made by the Mortgagor, interest at the Servicing Fee Rate on the Stated Principal Balance of the Mortgage Loan for the period covered by the payment of interest, subject to reduction as provided in Section 3.15.").

delinquency until about September 25, 2016—for 36 months—without resolution. This means that Ocwen saddled the Trusts with the expense of carrying this delinquent loan without resolution for 36 months while Ocwen received administrative fees over the entire period, thus materially and adversely affecting the interests of the Certificateholders.

b) <u>Mortgage Loan No. ----6455:</u> Starting from or about February 25, 2013, Ocwen allowed Mortgage Loan No. ----6455 from RALI 2007-QS8 to remain in delinquency until about November 25, 2013—for nine months—without resolution. Ocwen's saddling of the Trusts with the expenses of continuing to carry this delinquent loan without resolution and Ocwen's simultaneous receipt of excessive administrative fees materially and adversely affected the interests of the Certificateholders.

c) <u>Mortgage Loan No. ----6885:</u> From about April 25, 2013, Ocwen allowed Mortgage Loan No. ----6885 from RFMSI 2007-S4 to remain in delinquency until about February 25, 2016—for 34 months—without resolution. Ocwen's saddling of the Trusts with the expenses of continuing to carry this delinquent loan without resolution and Ocwen's simultaneous receipt of excessive administrative fees materially and adversely affected the interests of the Certificateholders.

101. By allowing Mortgage Loans to remain in delinquency for months or years without resolution, Ocwen enriched itself at the expense of Certificateholders by charging unwarranted servicing fees on mortgages that should have been liquidated, while also saddling the Trusts with the expenses of continuing to carry those Mortgage Loans.

102.  The number and amount of Mortgage Loans with these unreasonably long delinquencies caused direct harm to the interests of the Certificateholders, including Triaxx, and demonstrate that Ocwen's conduct was, at the least, grossly negligent or reckless.  The fact that over a thousand loans with an aggregate original balance of over $310 million and booked losses of over $74 million remained delinquent for six or more months without servicer action shows that these are not isolated violations but rather reflect a complete disregard for the duties that Ocwen owed as servicer.

*F.  Ocwen's Failed Foreclosures and REOs*

103.  The Loan Review also identified failed foreclosures and REOs.[24] A failed foreclosure or REO process is harmful to Certificateholders because it delays the liquidation of the mortgage property and the Trust's receipt of income associated with the liquidation proceeds.  At the same time, the delay imposes costs on the Trust.  A failed foreclosure requires the Trust to pay for another foreclosure, as a failed REO presumably does as well.  The delay likely also means that the Trust pays for the servicer's expenses (of managing the REO property and servicing the Mortgage Loan in foreclosure) for a longer period of time, thus depriving the Certificateholders of income.

104. It is unsurprising that Ocwen's servicing has led to failed foreclosures among the Mortgage Loans, given that in other proceedings Ocwen agreed to an independent compliance monitor's findings that it had engaged in improper foreclosure practices, such as by failing to confirm that it had the right to foreclose before initiating foreclosure proceedings, failing to ensure that its statements in foreclosure proceedings were correct, dual-tracking (pursuing foreclosure

---

[24] As stated above, REO refers to "real estate owned," i.e. a property owned by the Trust after foreclosure proceedings.  The fact that an REO property becomes non-REO indicates that the foreclosure was ineffective.

while modification applications are pending), and failing to maintain records confirming it was not pursuing foreclosure of service members on active duty.  Because Ocwen was on notice that its servicing practices were found to be improper as early as the year 2011, the fact that it nonetheless improperly serviced the Mortgage Loans from the year 2013 onward further shows that Ocwen's breaches are at least grossly negligent.

105.  The Loan Review found at least 190 Mortgage Loans, with an aggregate original balance of $57,869,176, that exhibited an episode of foreclosure that did not result in a resolution—either by the property becoming liquidated or by it becoming REO.  When a foreclosure fails to reach a resolution, the Trust must undertake the expense of carrying out the foreclosure process again and continues to pay the expense of servicing the loan for the interim period.   The following are examples:

     a)  <u>Mortgage Loan No. -----3993:</u> On or about April 25, 2014, Ocwen began foreclosure proceedings for Mortgage Loan No. -----3993 from RAST 2007-A1, but allowed the foreclosure process to unsuccessfully terminate seven months later, on or about November 25, 2014, at which point the loan returned to delinquency. This unsuccessful foreclosure process unduly saddled the Trusts with the expenses of continuing to carry this delinquent loan, as well as excessive servicing fees to Ocwen, thus materially and adversely affecting the interests of the Certificateholders.

     b)  <u>Mortgage Loan No. ----5061:</u> On or about February 25, 2013, Ocwen began foreclosure proceedings for Mortgage Loan No. ----5061 from RALI 2006-QS16, but allowed the foreclosure process to unsuccessfully terminate seven months later, on or about September 25, 2013, at which point the loan returned to delinquency.

Ocwen then had to take on the expense of conducting another foreclosure, which resulted in a liquidation only after another two months. This unsuccessful foreclosure process unduly saddled the Trusts with the expenses of continuing to carry this delinquent loan, as well as excessive servicing fees to Ocwen, thus materially and adversely affecting the interests of the Certificateholder.

c) Mortgage Loan No. ----9197: On or about August 25, 2014, Ocwen began foreclosure proceedings for Mortgage Loan No. ----9197 from RFMSI 2007-S4, but allowed the foreclosure process to unsuccessfully terminate three months later, on or about November 25, 2014, at which point the loan returned to delinquency. This unsuccessful foreclosure process unduly saddled the Trusts with the expenses of continuing to carry this delinquent loan, as well as excessive servicing fees to Ocwen, thus materially and adversely affecting the interests of the Certificateholders.

106. The investigation also revealed that at least 12 Mortgage Loans, with an aggregate original balance of $4,561,272, were initially identified as REO but later identified as neither REO nor liquidated. The following are examples:

a) Mortgage Loan No. ----3418: On or about September 25, 2014, the property underlying Mortgage Loan No. ----3418 from RALI 2007-QS8 was an REO property, but lost its REO status three months later, on or about December 25, 2014, at which point the loan returned to delinquency. This unsuccessful REO process unduly saddled the Trusts with the expenses of continuing to carry this delinquent loan, as well as excessive servicing fees to Ocwen, thus materially and adversely affecting the interests of the Certificateholders.

b) <u>Mortgage Loan No.</u> ----9519: On or about October 25, 2014, the property underlying Mortgage Loan No. ----9519 from RALI 2006-QS18 was an REO property, but lost its REO status two months later, on or about December 25, 2014, at which point the loan returned to delinquency.  This unsuccessful REO process unduly saddled the Trusts with the expenses of continuing to carry this delinquent loan, as well as excessive servicing fees to Ocwen, thus materially and adversely affecting the interests of the Certificateholders.

107.  These changes in the Mortgage Loans' statuses suggest there was a servicing or documentation deficiency that prevented the foreclosure or REO process from becoming complete and that Ocwen ignored document deficiencies in the mortgage file.  For example, Ocwen may have failed to complete the foreclosure or REO process because it used false or misleading affidavits in foreclosure proceedings, including through "robo-signing"—i.e. preparing, executing, notarizing, and filing affidavits whose affiants lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits—which is one of the practices that was alleged in regulatory actions against Ocwen.

108.  The number and amount of Mortgage Loans with these failed foreclosures and REOs caused direct harm to the interests of the Certificateholders, including Triaxx, and demonstrate that Ocwen's conduct was, at the least, grossly negligent or reckless.  The fact that Ocwen unsuccessfully foreclosed on or mishandled the REOs for at least 202 loans with aggregate original balance of over $62 million and booked losses of over $17 million shows that these are not isolated instances, but rather reflect a complete disregard by Ocwen for the duties that it owed as servicer.

109.  These failed foreclosures and REOs benefitted Ocwen at the expense of the Certificateholders.  While the Mortgage Loans remained in the Trusts, Ocwen enriched itself at

the expense of Certificateholders by charging unwarranted servicing fees on mortgages that should have been liquidated, while also saddling the Trusts with the expenses of continuing to carry those Mortgage Loans.  Moreover, to the extent that Ocwen retained affiliates to conduct these improper liquidations, instead of hiring unrelated and more cost effective providers at arms'-length prices, Ocwen profited at the expense of the Certificateholders.

110.  The  numerous improper servicing practices described above constitute material breaches of the servicing standards that Ocwen agreed to adhere to in, for example, Article III of the PSAs or Contracts.

## VI.    Ocwen's Breach of Its Duty to Avoid Conflicts of Interest and Its Duty to Perform Ministerial Acts with Due Care

111.  In addition to the above conduct which evidences violations of Ocwen's duties to avoid conflicts of interest and to perform ministerial acts with due care, other acts also demonstrate that Ocwen breached those extra-contractual duties.

112.  With respect to conflicts of interest, for example, according to the N.Y. Consent Order (discussed in detail below), Ocwen engaged related companies—under the common ownership of Ocwen's Executive Chairman—to do work at a higher cost or lower effectiveness than independent companies, costs that were "passed on to borrowers and investors."  Thus, Ocwen used related company Hubzu to host nearly all Ocwen auctions, even though Hubzu charged Ocwen more than it charged other customers.  Ocwen also used related company "REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform."

113.  In servicing the Mortgage Loans, Ocwen performed numerous ministerial acts, including verifying and maintaining loan information, sending borrowers periodic statements, processing

payments received from borrowers, booking charges, fees and expenses to borrowers, and managing borrower escrow accounts.  On information and belief, Ocwen failed to perform those ministerial acts with due care.

114.  This allegation is not only consistent with the results of the Loan Review, but it is supported by the set of facts agreed to by Ocwen in a New York State Department of Financial Services consent order, allegations of regulators relating to Ocwen's servicing practices, and in some cases based on Ocwen's own documents and the testimony of its senior employees.

115.  For example, as described further below (*see* Section VII.A), Ocwen agreed to certain facts in a December 2014 consent order with the New York State Department of Financial Services, including that Ocwen engaged in "repeated non-compliance" with New York law governing foreclosures by failing to send borrowers notices before commencing foreclosure proceedings.  In addition, Ocwen agreed that an examination in 2012 had revealed "instances that indicated widespread non-compliance" with an earlier agreement with the Department, including failing to provide borrowers with the direct contact information for their designated single point of contact (a customer care representative).

116.  Likewise, as described further below (*see* Section VII.E), in a complaint filed with this Court against Ocwen in April 2017, the CFPB cited internal reviews conducted by Ocwen in which Ocwen found that it lacked the documentation to support $98 million of corporate advances that it had charged to borrowers and discovered that 90% of the loans whose information it had verified contained errors or incomplete information that required corrections.

117.  According to the CFPB's complaint, a major source of Ocwen's problems was its REALServicing electronic database that Ocwen used to maintain and use data.  The complaint quoted Ocwen's own Head of Servicing as describing REALServicing as an "absolute train

wreck," and it cited 2016 testimony by Ocwen's former Head of Servicing Compliance "that she was 'absolutely' concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015."  According to the CFPB's complaint, one of the reasons for the problems with REALServicing was Ocwen's failure to verify data after transferring it from prior servicers on loans for which Ocwen acquired servicing rights.

118.  The CFPB's complaint alleged that in 2013, Ocwen acquired the servicing rights for 1.7 million loans associated with Residential Capital, LLC ("ResCap").  The complaint alleges that Ocwen failed to begin verifying the data for those loans until September 1, 2014, by which time it was servicing 1.1 million unverified ResCap loans on REALServicing.  By the end of 2014, the backlog of unverified ResCap loans grew to 1.3 million loans and was still at 263,000 by April of 2016.

119.  Notably, Ocwen acquired its servicing rights for the RALI/RFMSI Trusts (the trusts at issue here) through the ResCap bankruptcy proceedings.

120.  Triaxx expects that through discovery it will identify further failures by Ocwen to perform ministerial acts with due care in relation to its servicing of the Mortgage Loans.

121.  Ocwen's failure to exercise due care and avoid conflicts of interest has materially and adversely affected the interests of Certificateholders, including Triaxx, by, for example, burdening the collateral in the Trusts with improper charges, fees and expenses, denying the Trusts timely payment from escrow funds or successors in interest, and diverting borrower resources from paying principal and interest to dealing with such issues as misapplied charges and force-placed insurance.

## VII.    Ocwen's Documented History of Failing to Properly Service Mortgage Loans

122.  Ocwen's servicing breaches and breach of its obligations under the PSAs are consistent with the improper servicing practices by Ocwen that were the subject of various consent orders, investigations, and enforcement proceedings involving over fifty federal and state regulators.  The servicing breaches addressed in those proceedings show that during the relevant time period Ocwen's failures to adhere to industry servicing standards, to carry out ministerial acts with due care, and to avoid conflicts of interest were so widespread and persistent as to be systemic.  The fact that Ocwen systemically failed to adhere to industry servicing standards further demonstrates that Ocwen's breaches of its servicing duties with respect to the Mortgage Loans at issue here were grossly negligent or reckless.  Upon information and belief, Ocwen's servicing of the Trusts suffered from similar misconduct.

*A.  New York State Department of Financial Services Consent Order*

123.  In a December 2014 consent order with the New York State Department of Financial Services (the "Department"), Ocwen agreed to pay $150 million in penalties and restitution and agreed to facts that show repeated violations of New York law in its servicing of loans.  N.Y. Consent Order ¶ 11-24.  The facts to which Ocwen agreed include the following:

> a)  After entering into a September 1, 2011 Agreement on Mortgage Servicing Practices with the Department to ensure that it would properly service loans, Ocwen nevertheless engaged in "repeated non-compliance" with New York law governing foreclosures, including by failing to send borrowers notices before commencing foreclosure proceedings and failing to allege or document its standing to bring those proceedings.  N.Y. Consent Order ¶¶ 6-7.

b) A targeted examination in June 2012 also revealed "instances that indicated widespread non-compliance with the 2011 Agreement," including:

    i. failing to provide borrowers with the direct contact information for their designated single point of contact, a customer care representative whose role is to understand each assigned borrower's circumstances and history to ensure that the borrower receives efficient and consistent customer care;

    ii. dual-tracking (pursuing foreclosure while modification applications are pending);

    iii. failing to conduct an independent review of loan modification denials;

    iv. failing to demonstrate adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel;

    v. failing to demonstrate implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and

    vi. failing to ensure that trial or permanent modifications granted to borrowers by a prior servicer are honored upon transfer to Ocwen.

*Id.* ¶ 8.

c) Ocwen then entered into a consent order on December 5, 2012, which installed an independent compliance monitor, who began work in July 2013. *Id.* ¶¶ 9-10. In reviewing Ocwen's conduct, the monitor "identified numerous and significant violations of the 2011 Agreement, as well as New York State laws and regulations." *Id.* ¶ 11.

    i. The violations identified by the compliance monitor included, at a rate of about *three per reviewed loan*, improper foreclosure practices, such as failing to confirm that Ocwen had the right to foreclose before initiating foreclosure proceedings, failing to ensure that Ocwen's statements in foreclosure proceedings were correct, dual-tracking, failing to maintain

records confirming it was not pursuing foreclosure of service members on active duty, and failing to assign a designated customer care representative. *Id.* ¶ 12.

ii. The compliance monitor also found "(a) inadequate and ineffective information technology systems and personnel, and (b) widespread conflicts of interest with related parties." *Id.* ¶ 13. As a result of its inadequate systems, "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records." *Id.* ¶ 14. "For example, Ocwen's systems have been backdating letters for years. In many cases, borrowers received a letter denying a mortgage loan modification, and the letter was dated more than 30 days prior to the date that Ocwen mailed the letter. These borrowers were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter." *Id.* ¶ 15.

d)  According to the N.Y. Consent Order, "Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance." *Id.* ¶ 16. "Ocwen's core servicing functions rely on its inadequate systems" and "[d]espite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans. Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors." *Id.* ¶¶ 17-18.

Finally, "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations." *Id.* ¶ 19.

e)  With regard to conflicts of interest, "[t]he Department's review of Ocwen's mortgage servicing practices also uncovered a number of conflicts of interest between Ocwen and four other public companies . . . , all of which are chaired by Mr. William Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen. . . . Yet, Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies." *Id.* ¶ 20.

f)  According to the N.Y. Consent Order, Ocwen engaged related companies—under the common ownership of Ocwen's Executive Chairman [Mr. Erbey]—to do work at a higher cost or lower effectiveness than independent companies, costs that were "passed on to borrowers and investors." *Id.* ¶ 22. Thus, Ocwen used related company Hubzu to host nearly all Ocwen auctions, even though Hubzu charged Ocwen more than it charged other customers. *Id.* Ocwen also used related company "REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform." *Id.*

124. These agreed-to facts by Ocwen allow for a reasonable inference that Ocwen's material breaches of its obligations in the applicable PSAs or Contracts were due to its gross negligence or reckless disregard for its obligations.

*B.  Investigation by Consumer Financial Protection Bureau and Attorneys General*

125.  Further showing its systemic failure to properly service the loans, in 2014 Ocwen entered into a consent judgment with the Consumer Financial Protection Bureau, forty-nine states, and the District of Columbia in which it paid $127.3 million and agreed to provide another $2 billion in consumer relief to resolve claims over its servicing practices, which the CFPB and each of the states alleged to include the following misconduct:[25]

   a)  failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;

   b)  charging unauthorized fees for default-related services;

   c)  imposing force-placed insurance when Ocwen knew or should have known that borrowers already had adequate coverage;

   d)  providing false or misleading information in response to borrower complaints;

   e)  providing false or misleading information to borrowers regarding loans that have been transferred from other servicers;

   f)  failing to provide accurate and timely information to borrowers who seek information about loss mitigation services, including loan modifications;

   g)  falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

   h)  misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

   i)  providing false or misleading information to consumers about the status of the loss mitigation review, including while referring loans to foreclosure;

   j)  providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good-faith actively pursuing a loss mitigation alternative offered by Ocwen;

---

[25] *See, e.g.*, Consent J., *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, No. 1:13-cv-02025 (D. D.C. Feb. 26, 2014), ECF No. 12.

k) failing to properly calculate borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;

l) failing to properly process borrowers' applications for loan modifications including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance, and as a result, denying loan modifications to consumers who were eligible;

m) providing false or misleading reasons for denial of loan modifications;

n) with respect to transferred loans, failing to honor in-process trial modifications agreed to by prior servicers;

o) with respect to transferred loans with in-process trial and permanent modifications, deceptively seeking to collect payments from the consumer under the mortgage's original unmodified terms;

p) preparing, executing, notarizing, and presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments); and

q) robo-signing affidavits (preparing, executing, notarizing, and filing affidavits in foreclosure proceedings, whose affiants lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits).

*See* Compl. ¶ 20, *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.* (D. D.C. Dec. 19, 2013),

ECF No. 1.

## C. Consent Order with California Department of Business Oversight

126. In January 2015, Ocwen also settled for $2.5 million a proceeding brought by the

California Department of Business Oversight (the "DBO") relating to Ocwen's compliance with

California mortgage lending laws.[26]

---

[26] *See* Consent Order, *In the Matter of the Accus. of The Comm'r of Bus. Oversight v. Ocwen Loan Servicing, LLC* (C.A. Dept. of Bus. Oversight Jan. 23, 2015), File No.: 413-0544. Citations to "California Consent Order" are to this Consent Order.

127.  On or about January 8, 2013, the Commissioner of Business Oversight ("Commissioner"), in her capacity as head of the DBO, commenced a routine regulatory examination of Ocwen through her examination staff to ensure Ocwen's compliance with the California Residential Mortgage Lending Act ("CRMLA") and the California Homeowners Bill of Rights ("HBOR"). The DBO made three separate requests to Ocwen for the production of information and documents on October 15, 2013, July 31, 2014, and August 5, 2014.  Ocwen failed to produce the requested information and documents, causing the DBO to issue an Order to Discontinue Violations on June 16, 2014.  California Consent Order at 2.

128.  The DBO found that Ocwen had violated Section 50326 of the California Financial Code (for failure to make required reports), along with a prior Order to Discontinue Violations of that section, and sought to suspend Ocwen's residential mortgage lender and loan servicer license.[27] Ocwen's settlement with the DBO included, in addition to the $2.5 million penalty, an agreement to have an independent auditor examine Ocwen's servicing practices for compliance "with state and federal laws and regulations, including the [California Residential Mortgage Lending Act] and California Homeowner Bill of Rights."  California Consent Order ¶ 5.

D.  *Settlement with the SEC and Ongoing SEC Investigations*

129.  In January 2016, Ocwen agreed to pay a $2 million penalty after an SEC investigation.[28] According to the SEC's order instituting a settled administrative proceeding, Ocwen's internal controls failed to prevent conflicts of interest involving Ocwen's executive chairman, who played a dual role in many related party transactions.

---

[27] *See* Accus. In Supp. of Not. of Intent to Issue an Order Suspending Residential Mortgage Lender and Loan Servicer License at 6, *In the Matter of the Accus. of The Comm'r of Bus. Oversight* (C.A. Dept. of Bus. Oversight Oct. 3, 2014).

[28] *See* Order Instituting Cease-and-Desist Proceedings, *In the Matter of Ocwen Fin. Corp.* (Fed. Sec. L. Jan. 20, 2016), File No. 3-17060.

130.  Further, according to the SEC's order, Ocwen disclosed to investors that its executive chairman was required to recuse himself from transactions with related companies where he also served in a leadership position.  Ocwen, however, had no written policies or procedures on recusals for related party transactions, and the recusal practice that existed was flawed, inconsistent, and ad hoc.

131.  The SEC is also investigating Ocwen on two additional matters.  On February 10, 2015, Ocwen received a letter from the SEC seeking the voluntary production of documents and information in connection with an investigation relating to the use of collection agents by mortgage loan servicers.[29]

132.  On February 11, 2016, Ocwen received a letter from the SEC seeking the voluntary production of documents and information as part of an investigation relating to fees and expenses charged in connection with liquidated loans and REO properties held in non-agency RMBS trusts.[30]

133.  Thus, the allegations and admissions of widespread and persistent servicing violations by Ocwen over the last several years further demonstrate that Ocwen failed to properly service the Mortgage Loans at issue here and that it did so with, at the least, gross negligence or recklessness.

E.  *Enforcement Action by the Consumer Financial Protection Bureau*

134.  On April 20, 2017, the Consumer Financial Protection Bureau commenced an action against Ocwen over its improper servicing.  *See Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, No. 9:17-CV-80495 (S.D. Fl.).  The Florida Attorney General commenced a similar action separately.  The complaint in the CFPB's action draws on internal Ocwen documents, including

---

[29] *See* Ocwen Fin. Corp., Annual Report (Form 10-K) (Feb. 29, 2016); *see also* Ocwen Fin. Corp., Quarterly Report (Form 10-Q) (Oct. 27, 2016).
[30] *Id.*

emails, and testimony from Ocwen executives, indicating its factual claims have substantial evidentiary support.  Triaxx incorporates by reference those factual allegations of the complaint here.

135.  According to the CFPB, Ocwen improperly serviced loans using inaccurate information concerning, among other things, payment history and prior servicers' corporate advances or fees for servicing-related expenses, such as attorneys' fees, property inspection fees, property preservation fees, force-placed insurance charges, and foreclosure-related expenses.  *See* Compl. ¶¶ 41-42, *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.* (S.D. Fl.).  Ocwen charged borrowers for these charges and fees without any documentation that the charges and fees were appropriate, even though borrowers disputed them.  *See id.* ¶ 42.  Such charges and fees would have allowed Ocwen to divert to itself more funds from borrowers, to the detriment of Certificateholders.

136.  Ocwen's use of inaccurate loan information was widespread.  In internal reviews, Ocwen found that it lacked the documentation to support $98 million of corporate advances that it had charged to borrowers.  *Id.* at ¶ 43.  Ocwen also discovered in March of 2016 that 90% of the loans whose information it had verified contained errors or incomplete information that required corrections.  *Id.* ¶ 45.

137.  A major source of Ocwen's problems was its REALServicing electronic database that it used to maintain and use data.  Ocwen's Head of Servicing, in an internal communication to Ocwen's CEO, called Ocwen's technology an "absolute train wreck.  I know there's no shot in hell, but if I could change systems tomorrow I would.  I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling.  I'm not talking about differentiators here.  I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc.  It's ridiculous." *Id.* ¶ 50.

138. "Ocwen's former Head of Servicing Compliance testified in May 2016 that she was 'absolutely' concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015."  She said she and others "frequently" and "loudly" raised this concern and that the cause of the problems "would almost always be REALServicing and the processes that we're using."  *Id.* ¶ 51.

139. Ocwen tracked regulatory violations, risk areas, and other failures in Risk Convergence Reports.  Many of those items related to REALServicing.  Auditors concluded that 70 percent concerned technology projects and enhancements, and as of August 2015, many of the 550 items with the highest risk rating of R1 resulted from REALServicing deficiencies.  R1 denotes "Potential adverse impact of over $5 million"; "Actual or high possibility for fraud, waste or abuse"; "Breach of company policy or procedures (frequent, repeat, or disregarding policy)"; "Noncompliance with the law or regulation"; or "Material errors or irregularities are a reasonable possibility."  *Id.* ¶¶ 53-56.

140. Among the reasons for the inaccuracy of the data on REALServicing was Ocwen's failure to verify that data after transferring it from prior servicers on loans for which Ocwen acquired servicing rights.  Because the databases in use by prior servicers might have fields different from the ones on REALServicing, Ocwen had to match loan data on REALServicing to loan documentation to verify the data's accuracy.  *Id.* ¶ 37.

141. Ocwen aimed to verify loan data within 60 days of loading it onto REALServicing.  Yet it has failed to do so and has serviced millions of loans with unverified data.  In November 2014, Ocwen determined that verification took, on average, 261 days, and for some loans, verification took over a year.  *Id.* ¶¶ 38, 40.

142. In 2013, Ocwen acquired the servicing rights for 1.7 million loans associated with ResCap, including loans in the RALI/RFMSI Trusts.  Although Ocwen began loading data for these loans onto REALServicing on a rolling basis beginning in early 2014, Ocwen failed to begin verifying the data for these loans until September 1, 2014, and was servicing 1.1 million unverified ResCap loans on REALServicing by that time.  By the end of 2014, when Ocwen had finished loading data for the loans onto REALSerivicing, the backlog of unverified ResCap loans grew to 1.3 million loans and was still at 263,000 by April of 2016.  *See id.* ¶ 39.

143. Ocwen's struggles with inaccurate information even affected loan-modification packages, which an outside consultant found to contain incorrect terms, including net-present-value miscalculations, 80% of the time.  *Id.* ¶ 70.

144. REALServicing also suffered from other deficiencies.  The database used, for example, more than ten thousand comment codes and flags, yet Ocwen lacked a data dictionary defining those flags and codes or data fields.  As a result, Ocwen personnel did not understand the flags and codes or how to use them.  *Id.* ¶¶ 58-59.

145. REALServicing also lacked automation in its processes, requiring Ocwen personnel to manually execute tasks and introduce human error into the data.  *Id.* ¶ 61.  Even worse, as Ocwen's former Head of Servicing Compliance testified, "every business unit in the entire organization" lacked sufficient controls to prevent mistakes and to detect when mistakes occurred.  *Id.* ¶ 68.

146. REALServicing had no capacity to process the large number of loans Ocwen serviced, so it has been offline for large amounts of time—17,000 work hours by Ocwen's own count in 2014.  The unavailability of REALServicing exasperated Ocwen's Head of Loss Mitigation, who said in an internal communication in 2014, "I am sorry guys, this has broken my back.  Enough is enough on daily issues with these systems.  We have lost more than 15 days of production of past

3 months … I need this system up every day and performing.  It is clear by the issues over the past 3 months that there are not any controls on data and system quality." *Id.* ¶ 62.

147.  Ocwen "routinely failed to send borrowers timely and accurate periodic statements, failed to timely and accurately credit and apply borrower payments, and failed to correct billing and payment errors." *Id.* ¶ 74.

148.  Ocwen personnel and its lockbox vendor committed numerous payment-processing errors, including inaccurately processing multiple payments (e.g., two or more checks in one envelope), failing to store correspondence received with payments that identifies the payments, inaccurately recording (manually) wire payments from borrowers, and failing to apply received payments (including payments in suspense accounts) accurately.  *Id.* ¶¶ 81-90.

149.  Ocwen also mishandled the administration of borrowers' escrow accounts, failing to conduct or inaccurately conducting escrow analyses, failing to timely send borrowers accurate escrow statements, and failing to account for and apply borrower escrow shortage payments.  *Id.* ¶ 100.

150.  In September 2014, Ocwen's Head of Servicing Compliance said the following about escrow notices in internal emails: Escrow notices not compliant with RESPA, not sent timely or not sent at all are huge and are the foundation for all else.  These are, by the way, the three biggest borrower communication issues across the board for Ocwen - required content not included, letter not sent, or letter not sent timely.  This is estimated to impact 800,000 borrowers or 52% of the Ocwen customerbase." *Id.* ¶ 113.

151.  Ocwen's escrow-related problems surfaced in the bankruptcy context as well.  In late 2014, the Head of Ocwen's Escrow Department wrote in an email that was forwarded to Ocwen's CEO that "I've stressed importance of getting the BK escrow balance issues fixed, but no

confirmation of root cause or target correction date . . . .  It's a system issue because a bucket that determines the amount of money that a customer sends for their monthly payment can change with no record of why on the system . . . .  Please help get the importance across on this issue.  If this is not fixed, I cannot recommend that we move to analyze BK for the portfolio.  Even with a control report to catch them, there is still risk the balance will be wrong when you actually analyze the account."  *Id.* ¶ 118.

152.  Ocwen's administrative failures extended to borrowers' hazard insurance.  Ocwen failed to disburse borrower insurance payments to insurance companies, failed to apply funds in borrower escrow accounts for this purpose, disbursed payments incorrectly (double payments, wrong payee, etc.), charged borrowers for insurance that was not required, and force-placed insurance on properties that were already insured, and misreported to borrowers the amounts of insurance premiums due.  *Id.* ¶¶ 129-40.

153.  Ocwen also failed to properly identify and communicate with successors in interest to deceased borrowers, resulting in the denial of loss-mitigation or loan modification assistance that might have prevented unnecessary foreclosures.  *Id.* ¶ 156.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract

154.  Triaxx repeats and realleges each of the foregoing paragraphs as if specifically reproduced and set forth here.

155.  The PSAs and Contracts governing Ocwen's servicing obligations are valid contracts.

156.  Triaxx has performed all of its obligations under the PSAs and any applicable Contracts.

157.  Ocwen has breached the PSAs and other applicable Contracts by improperly servicing the Mortgage Loans and doing so with gross negligence or reckless disregard of its obligations and

duties.   For example, Ocwen has failed to properly (i) liquidate or foreclose on mortgage properties, (ii) handle REO properties, (iii) modify Mortgage Loans, and (iv) address delinquent Mortgage Loans, and its servicing failures have affected Mortgage Loans with an original principal balance of approximately $480 million and booked losses of approximately $175 million. Ocwen's breaches have materially and adversely affected the interests of the Certificateholders.

158.   As a result, Triaxx has suffered material losses and has been damaged by Ocwen's conduct.

## COUNT II
## Breach of Duty to Avoid Conflicts of Interest

159. Triaxx repeats and realleges each of the foregoing paragraphs as if specifically reproduced and set forth here.

160. Ocwen had certain extra-contractual duties to the Trusts and Certificateholders (including Triaxx), including the duty to avoid conflicts of interest that enrich it at the expense of the Certificateholders.  This duty applies notwithstanding any agreements that purport to define Ocwen's duties.

161. Ocwen has breached this duty to avoid conflicts of interest by enriching itself at the expense of the Certificateholders.  Ocwen's conduct in this regard was committed with gross negligence, recklessness, or willful misconduct.  For example, Ocwen has (i) improperly modified loans, which allowed it to continue receiving fees, (ii) improperly liquidated loans by charging excessive costs, (iii) booked losses on Mortgage Loans that were in excess of what would be expected in light of the Mortgage Loans' liquidation proceeds, allowed servicing advances, and reasonable liquidation costs, (iv) allowed Mortgage Loan delinquencies to continue without resolution for unduly long time periods, which saddled the Trusts with the expenses of continuing to carry those Mortgage Loans and at the same time enriched Ocwen by allowing it to charge

unwarranted servicing fees on mortgages which should have been liquidated, (v) failed to foreclose on Mortgage Loans, allowing it to continue receiving fees, and (vi) allowed REO properties to revert to non-REO status, which enabled Ocwen to continue receiving fees and charge the Trust for another foreclosure.

162.  For example, Ocwen has used related parties, such as Hubzu, to run foreclosure auctions, even though those related parties have charged more for services than unrelated parties.

163.  Ocwen's breaches of this duty to avoid conflicts of interest have materially and adversely affected the interests of the Certificateholders.

164.  As a result, Triaxx has suffered material losses and has been damaged by Ocwen's conduct.

## COUNT III
### Breach of Duty to Act With Due Care

165.  Triaxx repeats and realleges each of the foregoing paragraphs as if specifically reproduced and set forth here.

166.  Ocwen had certain extra-contractual duties to the Trusts and Certificateholders (including Triaxx), including the duty to perform ministerial acts with due care.  This duty applies notwithstanding any agreements that purport to define Ocwen's duties.

167.  Ocwen has breached this duty to perform ministerial acts with due care.  Ocwen's conduct in this regard was committed with gross negligence, recklessness, or willful misconduct. For example, Ocwen has (i) failed to maintain accurate loan information, (ii) booked improper charges, fees, and expenses to borrowers, (iii) unduly delayed in verifying information concerning loans whose mortgage-servicing rights it acquired, (iv) misreported loan information to borrowers, (v) mismanaged borrower escrow accounts, including by failing to accurately report information concerning those accounts to borrowers and failing to apply escrow payments, (vi) improperly

61

administered processes with regard to hazard insurance, for example, by failing to apply borrower escrow funds to pay for insurance, incorrectly disbursing insurance payments, misreporting the amount of insurance premiums due, and unnecessarily force-placing insurance, and (vii) failed to identify and communicate with successors in interest to deceased borrowers.

168.   Ocwen's breaches have materially and adversely affected the interests of the Certificateholders by, for example, burdening the collateral in the Trusts with improper charges, fees, and expenses, denying the Trusts timely payment from escrow funds or successors in interest, and diverting borrower resources from paying principal and interest to dealing with such issues as misapplied charges and force-placed insurance.

169.   As a result, Triaxx has suffered material losses and has been damaged by Ocwen's conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Triaxx respectfully requests that the Court enter judgment in Plaintiffs' favor that grants the following relief:

1. Damages in an amount to be proven at trial;

2. Prejudgment interest; and

3. Any other relief that the Court deems is just and proper.

Dated: October 16, 2017                    Respectfully submitted,

                                            Kobre & Kim LLP

                                            /s/ Adriana Riviere-Badell_____
                                            Adriana Riviere-Badell (Florida Bar Number: 30572)
                                            adriana.riviere-badell@kobrekim.com
                                            Kobre & Kim LLP
                                            201 South Biscayne Boulevard, Suite 1900
                                            Miami, Florida 33131
                                            Telephone: (305) 967-6100
                                            Facsimile: (305) 967-6120

                                            Steven G. Kobre (Admitted Pro Hac Vice)
                                            steven.kobre@kobrekim.com
                                            Steven W. Perlstein (Admitted Pro Hac Vice)
                                            steven.perlstein@kobrekim.com
                                            Josef M. Klazen (Admitted Pro Hac Vice)
                                            josef.klazen@kobrekim.com
                                            Phil Huynh (Admitted Pro Hac Vice)
                                            phil.huynh@kobrekim.com
                                            Darryl G. Stein (Admitted Pro Hac Vice)
                                            darry.stein@kobrekim.com
                                            Kobre & Kim LLP
                                            800 Third Avenue
                                            New York, New York 10022
                                            Telephone: (212) 488-1200
                                            Facsimile: (212) 488-1220

                                            Brad H. Samuels (Admitted Pro Hac Vice)
                                            brad.samuels@kobrekim.com
                                            Kobre & Kim LLP
                                            1919 M Street, NW
                                            Washington, DC 20036
                                            Telephone: (202) 664-1900
                                            Facsimile: (202) 664-1920

                                            *Attorneys for Plaintiffs Triaxx Asset Management LLC, Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by CM/ECF on October 16, 2017 on all counsel or parties of record on the service list.

By: /s/ Adriana Riviere-Badell
Adriana Riviere-Badell
Florida Bar No. 30572

## SERVICE LIST

Mark F. Bideau
Greenberg Traurig, P.A.
777 S. Flagler Drive, Suite 300 East
West Palm Beach, FL 33401
bideaum@gtlaw.com

Richard A. Jacobsen
Thomas N. Kidera
Aaron M. Rubin
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
rjacobsen@orrick.com
tkidera@orrick.com
amrubin@orrick.com

Paul F. Rugani
Orrick, Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104
prugani@orrick.com

*Attorneys for Defendant Ocwen Loan Servicing, LLC*